

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 0 6 2019
CHIEF JUSTICE

This opinion was
filed for record
at 8am on 6-6-19

Susan L. Carlson
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | NO. 91615-2 |
| Respondent, | EN BANC |
| v. | |
| ARLENE'S FLOWERS, INC., d/b/a ARLENE'S FLOWERS AND GIFTS, and BARRONELLE STUTZMAN, | Filed JUN 0 6 2019 |
| Appellants. | |
| ROBERT INGERSOLL and CURT FREED, | |
| Respondents, | |
| v. | |
| ARLENE'S FLOWERS, INC., d/b/a ARLENE'S FLOWERS AND GIFTS, and BARRONELLE STUTZMAN, | |
| Appellants. | |

GORDON McCLOUD, J.—The United States Supreme Court has tasked us with deciding whether the Washington courts violated the United States Constitution's guaranty of religious neutrality in our prior adjudication of this case.

We have fully reviewed the record with this issue in mind, and we have considered substantial new briefing devoted to this topic. We now hold that the answer to the Supreme Court's question is no: the adjudicatory bodies that considered this case did not act with religious animus when they ruled that the florist and her corporation violated the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, by declining to sell wedding flowers to a gay couple, and they did not act with religious animus when they ruled that such discrimination is not privileged or excused by the United States Constitution or the Washington Constitution.

OVERVIEW

This case is back before our court on remand from the United States Supreme Court. The Supreme Court vacated our original judgment and remanded "for further consideration in light of *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n.*" *Arlene's Flowers, Inc. v. Washington*, 138 S. Ct. 2671 (2018) (mem.). In *Masterpiece Cakeshop*, the Supreme Court held that the adjudicatory body tasked with deciding a particular case must remain neutral; that is, the adjudicatory body must "give full and fair consideration" to the dispute before it and avoid animus toward religion. 584 U.S. __, 138 S. Ct. 1719, 1732, 201 L. Ed. 2d 35 (2018). Disputes like those presented in *Masterpiece Cakeshop* and *Arlene's Flowers* "must be resolved with tolerance, without undue disrespect to sincere religious beliefs, and

without subjecting gay persons to indignities when they seek goods and services in an open market." *Id.*

We recognize the profound importance of a fair and neutral adjudicator. Although settled law compelled us to reject Arlene's Flowers and Barronelle Stutzman's claims the first time around, we recognized Stutzman's "sincerely held religious beliefs" and "analyze[d] each of [her] constitutional defenses carefully." *State v. Arlene's Flowers, Inc.*, 187 Wn.2d 804, 815-16, 830, 389 P.3d 543 (2017). And on remand, we have painstakingly reviewed the record for any sign of intolerance on behalf of this court or the Benton County Superior Court, the two adjudicatory bodies to consider this case. After this review, we are confident that the two courts gave full and fair consideration to this dispute and avoided animus toward religion. We therefore find no reason to change our original decision in light of *Masterpiece Cakeshop*.

The dispute we resolve today is the same as the dispute that formed the basis for our original opinion.[1] The State of Washington bars discrimination in "public . . . accommodation[s]" on the basis of "sexual orientation." RCW 49.60.215(1). Barronelle Stutzman owns and operates a place of public accommodation in our

---

[1] The careful reader will notice that starting here, major portions of our original (now vacated) opinion, *State v. Arlene's Flowers, Inc.*, 187 Wn.2d 804, are reproduced verbatim.

3

state: Arlene's Flowers Inc. Stutzman and her public business, Arlene's Flowers and Gifts, refused to sell wedding flowers to Robert Ingersoll because his betrothed, Curt Freed, is a man. The State and the couple sued, each alleging violations of the WLAD and the Consumer Protection Act (CPA), chapter 19.86 RCW. Stutzman defended on the grounds that the WLAD and CPA do not apply to her conduct and that if they do, those statutes violate her state and federal constitutional rights to free speech, free exercise of religion, and free association.

The Benton County Superior Court granted summary judgment to the State and the couple, rejecting all of Arlene's Flowers and Stutzman's claims. We granted review, and in our earlier opinion, we affirmed. The United States Supreme Court then granted appellants' petition for a writ of certiorari, vacated, and remanded, as discussed in the Procedural History section below.

On remand, we once again affirm. In doing so, we reject appellants' expansive reading of *Masterpiece Cakeshop*. We reject appellants' attempt to relitigate issues resolved in our first opinion and outside the scope of this remand. And we reject appellants' suggestion that the permanent injunction requires them to "personally attend and participate in same-sex weddings." Br. of Appellants (Nov. 13, 2018) at 25. As the superior court carefully noted, "The degree to which [Stutzman] voluntarily involves herself in an event . . . is not before the Court" and

therefore would not "be covered by an injunction." Clerk's Papers (CP) at 2347 n.23.

## FACTS

In 2004, Ingersoll and Freed began a committed, romantic relationship. In 2012, the people of our state voted to recognize equal civil marriage rights for same-sex couples. Laws of 2012, ch. 3, § 1 (Referendum Measure 74, approved Nov. 6, 2012). Freed proposed marriage to Ingersoll that same year. The two intended to marry on their ninth anniversary, in September 2013, and were "excited about organizing [their] wedding." Clerk's Papers (CP) at 350. Their plans included inviting "[a] hundred plus" guests to celebrate with them at Bella Fiori Gardens, complete with a dinner or reception, a photographer, a caterer, a wedding cake, and flowers. *Id.* at 1775-77.

By the time he and Freed became engaged, Ingersoll had been a customer at Arlene's Flowers for at least nine years, purchasing numerous floral arrangements from Stutzman and spending an estimated several thousand dollars at her shop. Stutzman is the owner and president of Arlene's Flowers. She employs approximately 10 people, depending on the season, including three floral designers, one of whom is herself. Stutzman knew that Ingersoll is gay and that he had been in a relationship with Freed for several years. The two men considered Arlene's Flowers to be "[their] florist." *Id.* at 350.

5

Stutzman is an active member of the Southern Baptist church. It is uncontested that her sincerely held religious beliefs include a belief that marriage can exist only between one man and one woman.

On February 28, 2013, Ingersoll went to Arlene's Flowers on his way home from work, hoping to talk to Stutzman about purchasing flowers for his upcoming wedding. Ingersoll told an Arlene's Flowers employee that he was engaged to marry Freed and that they wanted Arlene's Flowers to provide the flowers for their wedding. The employee informed Ingersoll that Stutzman was not at the shop and that he would need to speak directly with her. The next day, Ingersoll returned to speak with Ms. Stutzman. At that time, Stutzman told Ingersoll that she would be unable to do the flowers for his wedding because of her religious beliefs, specifically because of "her relationship with Jesus Christ." *Id.* at 155, 351, 1741-42, 1744-45, 1763. Ingersoll did not have a chance to specify what kind of flowers or floral arrangements he was seeking before Stutzman told him that she would not serve him. They also did not discuss whether Stutzman would be asked to bring the arrangements to the wedding location or whether the flowers would be picked up from her shop.

Stutzman asserts that she gave Ingersoll the names of other florists who might be willing to serve him, and that the two hugged before Ingersoll left her store.

Ingersoll maintains that he walked away from that conversation "feeling very hurt and upset emotionally." *Id.* at 1743.

Early the next morning, after a sleepless night, Freed posted a status update on his personal Facebook feed regarding Stutzman's refusal to sell him wedding flowers. The update observed, without specifically naming Arlene's Flowers, that the couple's "favorite Richland Lee Boulevard flower shop" had declined to provide flowers for their wedding on religious grounds, and noted that Freed felt "so deeply offended that apparently our business is no longer good business" because "[his] loved one [did not fit] within their personal beliefs." *Id.* at 1262. This message was apparently widely circulated, though Ingersoll testified that their Facebook settings were such that the message was "only intended for our friends and family." *Id.* at 1760, 1785. Eventually, the story drew the attention of numerous media outlets.

As a result of the "emotional toll" Stutzman's refusal took on Freed and Ingersoll, they "lost enthusiasm for a large ceremony" as initially imagined. *Id.* at 1490. In fact, the two "stopped planning for a wedding in September 2013 because [they] feared being denied service by other wedding vendors." *Id.* at 351. The couple also feared that in light of increasing public attention—some of which caused them to be concerned for their own safety—as well as then-ongoing litigation, a larger wedding might require a security presence or attract protesters, such as the Westboro Baptist group. So they were married on July 21, 2013, in a modest

ceremony at their home. There were 11 people in attendance. For the occasion, Freed and Ingersoll purchased one bouquet of flowers from a different florist and boutonnieres from their friend. When word of this story got out in the media, a handful of florists offered to provide them wedding flowers free of charge.

Stutzman also received a great deal of attention from the publicity surrounding this case, including threats to her business and other unkind messages.

Prior to Ingersoll's request, Arlene's Flowers had never had a request to provide flowers for a same-sex wedding, and the only time Stutzman has ever refused to serve a customer is when Ingersoll and Freed asked her to provide flowers for their wedding. The decision not to serve Ingersoll was made strictly by Stutzman and her husband. After Ingersoll and Freed's request, Stutzman developed an "unwritten policy" for Arlene's Flowers that they "don't take same sex marriages." *Id.* at 120. Stutzman states that the only reason for this policy is her conviction that "biblically[,] marriage is between a man and a woman." *Id.* at 120-21. Aside from Ingersoll and Freed, she has served gay and lesbian customers in the past for other, non-wedding-related flower orders.

Stutzman maintains that she would not sell Ingersoll any arranged flowers for his wedding, even if he were asking her only to replicate a prearranged bouquet from a picture book of sample arrangements. She believes that participating, or allowing any employee of her store to participate, in a same-sex wedding by providing custom

8

floral arrangements and related customer service is tantamount to endorsing marriage equality for same-sex couples. She draws a distinction between creating floral arrangements—even those designed by someone else—and selling bulk flowers and "raw materials," which she would be happy to do for Ingersoll and Freed. *Id.* at 546-47. Stutzman believes that to create floral arrangements is to use her "imagination and artistic skill to intimately participate in a same-sex wedding ceremony." *Id.* at 547. However, Stutzman acknowledged that selling flowers for an atheistic or Muslim wedding would not be tantamount to endorsing those systems of belief.

By Stutzman's best estimate, approximately three percent of her business comes from weddings. Stutzman is not currently providing any wedding floral services (other than for members of her immediate family) during the pendency of this case.

PROCEDURAL HISTORY

After the State became aware of Stutzman's refusal to sell flowers to Ingersoll and Freed, the Attorney General's Office sent Stutzman a letter. It sought her agreement to stop discriminating against customers on the basis of their sexual orientation and noted that doing so would prevent further formal action or costs against her. The letter asked her to sign an "Assurance of Discontinuance," which

stated that she would no longer discriminate in the provision of wedding floral services. Stutzman refused to sign the letter.

As a result, the State filed a complaint for injunctive and other relief under the CPA and the WLAD against both Stutzman and Arlene's Flowers, in Benton County Superior Court on April 9, 2013. Stutzman filed an answer on May 16, 2013, asserting, among other defenses, that her refusal to furnish Ingersoll with wedding services was protected by the state and federal constitutions' free exercise of religion, free speech, and freedom of association guaranties. Ingersoll and Freed filed a private lawsuit against Arlene's Flowers and Stutzman on April 18, 2013, which the trial court consolidated with the State's case on July 24, 2013. The parties filed various cross motions for summary judgment. The trial court ultimately entered judgment for the plaintiffs in both cases, awarding permanent injunctive relief, as well as monetary damages for Ingersoll and Freed to cover actual damages, attorney fees, and costs, and finding Stutzman personally liable.

When it granted the plaintiffs' motions for summary judgment, the trial court made seven rulings that are at issue in this appeal. First, it issued two purely statutory rulings: (1) that Stutzman violated the WLAD's public accommodations provision (RCW 49.60.215(1)) and the CPA (*see* RCW 19.86.020; RCW 49.60.030) by refusing to sell floral services for same-sex weddings and (2) that both Stutzman (personally) and Arlene's Flowers (the corporate defendant) were liable for these

violations. CP at 2566-600. Next, the court made five constitutional rulings. It concluded that the application of the WLAD's public accommodations provision to Stutzman in this case (1) did not violate Stutzman's right to free speech under the First Amendment to the United States Constitution or article I, section 5 of the Washington Constitution, (2) did not violate Stutzman's right to religious free exercise under the First Amendment, (3) did not violate her right to free association under the First Amendment, (4) did not violate First Amendment protections under the hybrid rights doctrine, and (5) did not violate Stutzman's right to religious free exercise under article I, section 11 of the Washington Constitution. *Id.* at 2601-60.

Stutzman appealed directly to this court, assigning error to all seven of those rulings. We granted direct review. Order, *Ingersoll v. Arlene's Flowers, Inc.*, No. 91615-2 (Wash. Mar. 2, 2016). With respect to most of the claims, Stutzman and Arlene's Flowers make identical arguments—in other words, Stutzman asserts that both she and her corporation enjoy identical rights of free speech, free exercise, and free association.[2] It is only with respect to the CPA claim that Stutzman asserts a

---

[2] In their brief on remand, appellants again claim that the corporation's "free-exercise rights are synonymous with Mrs. Stutzman's." Br. of Appellants (Nov. 13, 2018) at 18 n.3. But the general rule is that "'[a] corporation exists as an organization distinct from the personality of its shareholders.'" Br. for Professor Kent Greenfield as Amicus Curiae in Supp. of Resp'ts at 8 (alteration in original) (quoting *Grayson v. Nordic Constr. Co., Inc.*, 92 Wn.2d 548, 552, 599 P.2d 1271 (1979)). In this case, however, we need not resolve whether some exception to that rule allows Arlene's Flowers to share the free exercise rights of its shareholders, officers, and employees. Even assuming the rights are

separate defense: she argues that even if Arlene's Flowers is liable for the CPA violation, she cannot be *personally* liable for a violation of that statute.

In our original opinion, we affirmed the trial court's rulings. *Arlene's Flowers*, 187 Wn.2d at 856. Appellants then petitioned the United States Supreme Court for a writ of certiorari, seeking review of their federal free speech and free exercise claims. Pet. for Writ of Cert., *Arlene's Flowers*, No. 17-108 (U.S. July 14, 2017). Before ruling on the petition, the United States Supreme Court issued its decision in *Masterpiece Cakeshop*, 138 S. Ct. 1719, a case involving similar issues to those in the case before us now. The Supreme Court then granted appellants' petition, vacated our original judgment, and remanded "for further consideration in light of *Masterpiece Cakeshop*." *Arlene's Flowers*, 138 S. Ct. 2671.

The parties, as well as several other interested organizations and individuals (amici curiae), have fully briefed what they see as the issues on remand.[3] Appellants now claim that the permanent injunction issued by the superior court requires them to "personally attend and participate in same-sex weddings." Br. of Appellants (Nov. 13, 2018) at 25. Stutzman made a similar argument before the superior court,

---

synonymous, we found no violation of any constitutional right in our first opinion, and today we hold that that opinion is unaffected by *Masterpiece Cakeshop*.

[3] The parties have not moved for oral argument, and we find the briefing sufficient for our consideration of this case on remand.

claiming "that other aspects of her involvement in weddings are speech, including singing, standing for the bride, clapping to celebrate the marriage, and in one instance counseling the bride." CP at 2347 n.23. But as the superior court explained,

> Tellingly, Stutzman does not claim that she was being paid to do any of these things. Said another way, she does not claim that these are services that she is providing for a fee to her customers such that they would be covered by an injunction. The degree to which she voluntarily involves herself in an event outside the scope of services she must provide to all customers on a non-discriminatory basis (if she provides the service in the first instance) is not before the Court.

*Id.* The issue was not before the superior court then, and it is not before this court now.

In addition, Arlene's Flowers and Stutzman filed a motion to supplement the record or for judicial notice, as did the State of Washington. We passed the motions to supplement or for judicial notice to the merits, and we now deny both motions and adhere to our original decision for the reasons explained below.

ANALYSIS

A grant, vacate, remand (GVR) order "is neither an outright reversal nor an invitation to reverse; it is merely a device that allows a lower court that had rendered its decision without the benefit of an intervening clarification to have an opportunity to reconsider that decision and, if warranted, to revise or correct it." *Gonzalez v. Justices of Mun. Court*, 420 F.3d 5, 7 (1st Cir. 2005). "Consequently, we do not treat the Court's GVR order as a thinly-veiled direction to alter course . . . ." *Id.*; *see*

13

*also Wright v. Florida*, 256 So. 3d 766, 770 (Fla. 2018) ("[W]e will not guess at the implied intentions of the Supreme Court's GVR order."), *cert. denied* (U.S. June 3, 2019) (No. 18-8653). Instead, we follow the Supreme Court's clear instruction to "further consider[]" this case "in light of *Masterpiece Cakeshop*." *Arlene's Flowers*, 138 S. Ct. 2671; *see also Gonzalez*, 420 F.3d at 8 ("As a general rule, 'when the Supreme Court remands in a civil case, the [court on remand] should confine its ensuing inquiry to matters coming within the specified scope of the remand.'" (quoting *Kotler v. Am. Tobacco Co.*, 981 F.2d 7, 13 (1st Cir. 1992))).

I.  In *Masterpiece Cakeshop*, the Supreme Court held that the adjudicatory body tasked with deciding a particular case must remain neutral

In *Masterpiece Cakeshop*, Jack Phillips, the shop's owner, told a same-sex couple "that he would not create a cake for their wedding because of his religious opposition to same-sex marriages—marriages the State of Colorado itself did not recognize at that time." 138 S. Ct. at 1723. After being turned away, the couple filed a charge with the Colorado Civil Rights Commission (Commission), *id.*, a state adjudicatory body "charged with the solemn responsibility of fair and neutral enforcement of Colorado's antidiscrimination law," *id.* at 1729. The couple alleged that the shop owner had illegally discriminated against them "on the basis of sexual orientation." *Id.* at 1723. The Commission ruled in the couple's favor, and the Colorado courts affirmed. *Id.*

14

At the Supreme Court, Phillips argued that Colorado violated his First Amendment rights by requiring him "to use his artistic skills to make an expressive statement, a wedding endorsement in his own voice and of his own creation." *Id.* at 1728; U.S. CONST. amend. I. The Supreme Court explained that "the baker likely found it difficult to find a line where the customers' rights to goods and services became a demand for him to exercise the right of his own personal expression for their message, a message he could not express in a way consistent with his religious beliefs." *Id.* The Court found the baker's "dilemma . . . particularly understandable" given that Colorado did not yet "recognize the validity of gay marriages performed in its own State." *Id.*

At the same time, the Court reaffirmed that "while . . . religious and philosophical objections [to gay marriage] are protected, it is a general rule that such objections do not allow business owners and other actors in the economy and in society to deny protected persons equal access to goods and services under a neutral and generally applicable public accommodations law." *Id.* at 1727 (citing *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 572, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995); *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 402 n.5, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968) (per curiam)). In fact, the *Piggie Park* footnote to which the United States Supreme Court cites explicitly states that the shop owners' defense in that case—that the Civil Rights Act of 1964,

42 U.S.C. § 2000e, "'constitutes an interference with the free exercise of the Defendant's religion'"—was "patently frivolous." *Piggie Park*, 390 U.S. at 402 n.5 (internal quotation marks omitted) (quoting *Newman v. Piggie Park Enters., Inc.*, 377 F.2d 433, 438 (4th Cir. 1967) (Winter, J., concurring specially)). Indeed, in *Masterpiece Cakeshop*, "Petitioners conceded . . . that if a baker refused to sell any goods or any cakes for gay weddings, . . . the State would have a strong case under [the Supreme] Court's precedents that this would be a denial of goods and services that went beyond any protected rights of a baker who offers goods and services to the general public and is subject to a neutrally applied and generally applicable public accommodations law." 138 S. Ct. at 1728.

As to weddings, the Supreme Court noted that "it can be assumed that a member of the clergy who objects to gay marriage on moral and religious grounds could not be compelled to perform the ceremony without denial of his or her right to the free exercise of religion." *Id.* at 1727. But the Court observed the narrowness of such an exception:

> Yet if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons, thus resulting in a community-wide stigma inconsistent with the history and dynamics of civil rights laws that ensure equal access to goods, services, and public accommodations.

*Id.* Thus,

any decision in favor of the baker would have to be sufficiently constrained, lest all purveyors of goods and services who object to gay marriages for moral and religious reasons in effect be allowed to put up signs saying "no goods or services will be sold if they will be used for gay marriages," something that would impose a serious stigma on gay persons.

*Id.* at 1728-29.

In sum, the issue before the Supreme Court was one of the "proper reconciliation of at least two principles." *Id.* at 1723. "The first is the authority of a State and its governmental entities to protect the rights and dignity of gay persons who are, or wish to be, married but who face discrimination when they seek goods or services." *Id.* "The second is the right of all persons to exercise fundamental freedoms under the First Amendment, as applied to the States through the Fourteenth Amendment." *Id.*

But the Supreme Court did not reconcile those two principles. Instead, the Court explained that the Commission failed to adjudicate "with the religious neutrality that the Constitution requires" and held that "whatever the outcome of some future controversy involving facts similar to these, the Commission's actions here violated the Free Exercise Clause [of the First Amendment]." *Id.* at 1724. "Phillips was entitled to a neutral decisionmaker who would give full and fair consideration to his religious objection as he sought to assert it in all of the circumstances in which this case was presented, considered, and decided." *Id.* at

17

1732. Disputes like Phillips' "must be resolved with tolerance, without undue disrespect to sincere religious beliefs, and without subjecting gay persons to indignities when they seek goods and services in an open market." *Id.*

The Supreme Court therefore ruled that the Commission violated the free exercise clause of the First Amendment in two respects: two of its members made disparaging comments about religion and it treated similarly situated parties differently. We address each of those holdings below.

### A. Members of an Adjudicatory Body May Not Disparage the Religion of a Party Before It

The Supreme Court observed that two of the seven commissioners on the Commission "endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, implying that religious beliefs and persons are less than fully welcome in Colorado's business community." *Id.* at 1729. The Court took particular issue with the following statement made by a commissioner:

> "Freedom of religion and religion has been used to justify all kinds of discrimination throughout history, whether it be slavery, whether it be the Holocaust, whether it be—I mean, we—we can list hundreds of situations where freedom of religion has been used to justify discrimination. And to me it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others."

*Id.* That statement, the Court reasoned, characterized the baker's religion as "something insubstantial and even insincere," which "is inappropriate for a

18

Commission charged with the solemn responsibility of fair and neutral enforcement of Colorado's antidiscrimination law—a law that protects against discrimination on the basis of religion as well as sexual orientation." *Id.* The other commissioners did not object to this statement, nor did they object to two related statements made by another commissioner. *Id.* "And the later state-court ruling reviewing the Commission's decision did not mention those comments, much less express concern with their content." *Id.* at 1729-30.

The Supreme Court, emphasizing that the statements were made "by an adjudicatory body deciding a particular case"—not "by lawmakers" or members of the executive branch—concluded that the "statements cast doubt on the fairness and impartiality of the Commission's adjudication of Phillips' case." *Id.* at 1730.

B. An Adjudicatory Body Must Treat Similarly Situated Parties Equally

The Court also discussed "the difference in treatment" between Phillips' case and the cases of three other bakers who refused, on the basis of conscience, "to create cakes with images that conveyed disapproval of same-sex marriage, along with religious text." *Id.* at 1730. In those three cases, all of which occurred "while enforcement proceedings against Phillips were ongoing," *id.* at 1728, the Colorado

Civil Rights Division[4] "found that the baker acted lawfully in refusing service," *id.* at 1730. The Supreme Court held that "the Commission's consideration of Phillips' religious objection did not accord with its treatment of these other objections." *Id.*

II. *Masterpiece Cakeshop* does not affect our original decision because the adjudicatory bodies tasked with deciding this case remained neutral

Throughout the course of this litigation, appellants have never alleged that the adjudicatory bodies tasked with deciding this case failed to remain neutral. Since the argument has never been made, we had no reason to discuss in our first opinion the importance of a neutral adjudicatory body or to comb the record for signs of bias from the courts.

Even on remand, appellants still do not claim that our court or the Benton County Superior Court failed to adjudicate "with the religious neutrality that the Constitution requires." *Masterpiece Cakeshop*, 138 S. Ct. at 1724. Presumably, appellants do not make such a claim because the record would not support it. Indeed, the record reveals that the courts remained neutral "in all of the circumstances in which this case was presented, considered, and decided." *Id.* at 1732. In its decision, the Benton County Superior Court acknowledged that "Stutzman has a sincerely-held religious belief" that is "entirely consistent" with her church's "doctrinal

---

[4] The Colorado Civil Rights Division is tasked with investigating claims and referring those with potential merit to the Commission. *Masterpiece Cakeshop*, 138 S. Ct. at 1725.

statement," and the superior court refused to "inquire further in the matter." CP

2355. In fact, the superior court went out of its way to note that it

> intend[ed] no disrespect and d[id] not mean to imply either that
> Stutzman possesses any racial animus, or that she has conducted herself
> in any way inconsistently with Resolutions of the [Southern Baptist
> Church]'s direction to condemn "any form of gay-bashing,
> disrespectful attitudes, hateful rhetoric, or hate-incited actions" toward
> gay men or women.

CP at 2360 n.31. Our court also recognized Stutzman's "sincerely held religious

beliefs," *Arlene's Flowers*, 187 Wn.2d at 815-16, and "analyze[d] each of [her]

constitutional defenses carefully," *id.* at 830. After carefully reviewing the record,

including transcripts of hearings and written orders, and after carefully reviewing

our prior opinion, we are confident that the courts resolved this dispute "with

tolerance, without undue disrespect to sincere religious beliefs, and without

subjecting gay persons to indignities when they seek goods and services in an open

market." *Id.* at 1732.

Apparently realizing the limits of *Masterpiece Cakeshop*, appellants attempt

to stretch its holding beyond recognition and to relitigate issues resolved in our first

opinion and outside the scope of *Masterpiece Cakeshop*. We reject this attempt and

instead comply with the Supreme Court's explicit mandate to "further consider[]"

our original judgment "in light of *Masterpiece Cakeshop*." *Arlene's Flowers*, 138 S. Ct. 2671; *see also Gonzalez*, 420 F.3d at 7-8.[5]

III.    We deny the motions to supplement the record or to take judicial notice

This court will grant a motion to supplement the record or to take judicial notice only if the proposed supplemental materials are relevant to the outcome of the proceeding. For example, we "may direct that additional evidence on the merits of the case be taken before the decision of a case on review if" "additional proof of facts *is needed to fairly resolve the issues on review*," "the additional evidence *would probably change the decision being reviewed*," and "*it would be inequitable to decide the case solely on the evidence already taken in the trial court*." RAP 9.11(a) (emphasis added). If the additional evidence is irrelevant, it is not needed to resolve the issues on review, it would not change the decision being reviewed, and it would therefore be equitable to decide the case without the irrelevant evidence. Additionally, in some situations we may take judicial notice of adjudicative facts

---

[5] For this reason, we also reject appellants' attempt to rely on *Janus v. American Federation of State, County, & Municipal Employees, Council 31*, ___ U.S. ___, 138 S. Ct. 2448, 201 L. Ed. 2d 924 (2018), and *National Institute of Family & Life Advocates v. Becerra*, ___ U.S. ___, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018). Both of those opinions were issued after the Supreme Court remanded this case, and therefore both are outside the scope of the remand. Even if we were to consider those cases, neither involves the type of public accommodations statute at issue here or in *Masterpiece Cakeshop*. As *Masterpiece Cakeshop* observes, "The outcome of cases like this in other circumstances must await further elaboration in the courts." 138 S. Ct. at 1732. Neither *Janus* nor *Becerra* provides further elaboration.

22

under our Evidence Rules—but only if those facts are relevant. ER 201; ER 402 ("Evidence which is not relevant is not admissible.").

Appellants Arlene's Flowers and Stutzman filed a motion to supplement the record or for this court to take judicial notice of supplemental materials. The proposed supplemental materials concern a single unrelated incident that occurred after we issued our first opinion in this case but before the Supreme Court ruled on appellants' petition for writ of certiorari. In that unrelated incident, appellants claim that "the owner of Bedlam Coffee in Seattle expelled a group of Christian customers visiting his shop." Appellants' Mot. to Suppl. R. or for Judicial Notice at 2. The crux of appellants' argument is that the attorney general sought to enforce the WLAD in the case before us but not in the incident at the coffee shop, revealing "hostility toward Mrs. Stutzman's beliefs." *Id.* at 7.

Respondent State also filed a motion to supplement the record or for this court to take judicial notice of supplemental materials. Although the State argues that the incident in the coffee shop is irrelevant, it requests that if we grant appellants' motion, then we should also grant its motion "to give a more complete picture of the incident described." Resp't State of Wash.'s Mot. to Suppl. R. or for Judicial Notice at 3-4. For their part, respondents Ingersoll and Freed argue that "the other parties' proposed supplemental materials are irrelevant." Br. of Resp'ts Ingersoll & Freed on Remand from the U.S. Supreme Ct. (Jan. 14, 2019) at 13 n.3.

We agree with respondents Ingersoll and Freed and hold that the attorney general's response to the incident at the coffee shop is irrelevant to this case. As discussed above, the Supreme Court in *Masterpiece Cakeshop* held that the *adjudicatory* body tasked with deciding a particular case must remain neutral. That Court was explicitly sensitive to the context in which the lack of neutrality occurred: during adjudication by the adjudicatory body deciding the case. *Masterpiece Cakeshop*, 138 S. Ct. at 1729-30 (describing statements made by lawmakers during lawmaking as "a very different context"); *see also* Br. of Church-State Scholars as Amici Curiae in Supp. of Pls.-Resp'ts (Mar. 13, 2019) at 9 (noting "*Masterpiece*'s clear sensitivity to the institutional context in which the government allegedly engaged in religious targeting"). The holding of *Masterpiece Cakeshop* might make additional evidence about a lack of neutrality on behalf of the adjudicatory bodies that heard this case relevant. But that is not what the proposed evidence is about; the parties instead seek to introduce evidence about a lack of neutrality on behalf of the attorney for one of the parties, the attorney general of the State of Washington.

It would take a broad expansion of *Masterpiece Cakeshop* to apply its holding—that the *adjudicatory* body hearing a case must show religious neutrality— to a *party*. That is especially true here, where the party supposedly exhibiting antireligious bias is Washington's attorney general. By arguing that *Masterpiece Cakeshop*'s holding about adjudicatory bodies applies to the attorney general's

24

enforcement decisions, appellants essentially seek to revive their selective-enforcement claim, a claim that was rejected by the superior court, CP at 2361-64, *and abandoned on appeal, see* Statement of Grounds for Direct Review at 6.

Appellants' decision to abandon that claim on appeal was sound. Controlling precedent shows that claims of selective enforcement arise in "a very different context" than claims of biased adjudication. *Masterpiece Cakeshop*, 138 S. Ct. at 1729-30. In the criminal arena, the United States Supreme Court has noted that selective-enforcement claims "invade a special province of the Executive—its prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489, 119 S. Ct. 936, 142 L. Ed. 2d 940 (1999). Courts are wary to question a prosecutor's decision of which claims to pursue and thus generally "'presume that [prosecutors] have properly discharged their official duties.'" *United States v. Armstrong*, 517 U.S. 456, 464, 116 S. Ct. 1480, 134 L. Ed. 2d 687 (1996) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15, 47 S. Ct. 1, 71 L. Ed. 131 (1926)). To overcome this presumption of regularity, the Court has "emphasized that the standard for proving [selective-enforcement claims] is particularly demanding." *Am.-Arab Anti-Discrimination Comm.*, 525 U.S. at 489. A defendant must "introduce 'clear evidence' displacing the presumption that a prosecutor has acted lawfully." *Id.* (citing *Armstrong*, 517 U.S. at 463-65).

Rather than grapple with this precedent, appellants seem to argue that selective-enforcement claims premised on the free exercise clause should not be subject to the same demanding standard to which all other selective-enforcement claims are subject. Appellants' Resp. to Amici Curiae (Mar. 22, 2019) at 6-7. In making this argument, appellants rely on two cases controlling in our court: *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S. Ct. 2217, 124 L. Ed. 2d 472 (1993), and *Masterpiece Cakeshop*. But the issue in *Lukumi Babalu Aye* was *not* whether the executive branch selectively enforced a law in an unconstitutional manner; it was whether the law itself was neutral and generally applicable. 508 U.S. at 531-32. And as appellants recognize, *Masterpiece Cakeshop*—the case with which we are most concerned on remand—says nothing about selective-enforcement claims. Appellants' Resp. to Amici Curiae (Mar. 22, 2019) at 5-6. Against this backdrop, we decline to recognize the carve-out requested by appellants but missing from any controlling precedent.

Even if appellants were correct, they fail to recognize that only one of the two consolidated cases before us would be affected. The attorney general was not a party to or a lawyer in Ingersoll and Freed's separate, private lawsuit, and the alleged selective-enforcement claim would therefore not extend to it.[6]

---

[6] Appellants argue that *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 718, 11 L. Ed. 2d 686 (1964), suggests otherwise. Reply Br. of Appellants (Feb. 13, 2019)

In any event, we decline to expansively read *Masterpiece Cakeshop* to encompass the "very different context" of executive branch discretion. We do not believe that the Supreme Court intended to silently overturn any of its selective-enforcement precedents or to create a carve-out within that precedent for claims based on the free exercise clause. That is not to say that the Washington attorney general is free to enforce the WLAD in a manner that offends the state or federal constitution. We simply recognize our mandate on remand to further consider this case in light of *Masterpiece Cakeshop*, a case that requires neutrality from the adjudicatory bodies hearing a particular case and says nothing about claims of selective enforcement by the executive branch. The remand is not an invitation to the parties to litigate new issues outside the scope of both our initial ruling and *Masterpiece Cakeshop*. Because the proposed supplemental evidence has nothing to do with the neutrality of either our court or the Benton County Superior Court, it is irrelevant, and the motions are therefore denied.

---

at 13. *Sullivan* involved the constitutionality of a state law, the enforcement of which supplied the necessary state action. 376 U.S. at 265. At this stage of this case, we are no longer concerned with the constitutionality of any state law; we held that the state laws relevant here were constitutional in our first opinion, and *Masterpiece Cakeshop* does not affect that analysis. Instead, we are concerned solely with *Masterpiece Cakeshop*'s mandate that state adjudicatory bodies must exhibit religious neutrality. Appellants argue that *Masterpiece Cakeshop*'s holding extends to the executive branch and that the attorney general failed to act with the required neutrality. Even if that interpretation were correct, it would have no bearing on the individual plaintiffs' lawsuit because the attorney general was not a party to or a lawyer in that case.

27

IV. Because the Washington courts resolved this dispute with tolerance, we find no reason to alter our original opinion

As noted above, this case presents both statutory and constitutional questions. Both are reviewed de novo. *Williams v. Tilaye*, 174 Wn.2d 57, 61, 272 P.3d 235 (2012) ("[s]tatutory interpretation is a question of law reviewed de novo" (citing *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d 282 (2003))); *Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 503, 198 P.3d 1021 (2009) (appellate court "review[s] all constitutional challenges de novo" (citing *State v. Jones*, 159 Wn.2d 231, 237, 149 P.3d 636 (2006))).

A. Stutzman's Refusal To Provide Custom Floral Arrangements for a Same-Sex Wedding Violated the WLAD's Prohibition on Discrimination in Public Accommodations, RCW 49.60.215

Stutzman's first statutory argument implicates the WLAD, chapter 49.60 RCW. The trial court ruled that Stutzman violated RCW 49.60.215, which prohibits discrimination in the realm of public accommodations. That statute provides:

(1) It shall be an unfair practice for any person or the person's agent or employee to commit an act which directly or indirectly results in any distinction, restriction, or discrimination, or the requiring of any person to pay a larger sum than the uniform rates charged other persons, or the refusing or withholding from any person the admission, patronage, custom, presence, frequenting, dwelling, staying, or lodging in any place of public resort, accommodation, assemblage, or amusement,

28

except for conditions and limitations established by law and applicable to all persons, regardless of . . . sexual orientation . . . .

RCW 49.60.215. The protected class status of "sexual orientation" was added to this provision in 2006. LAWS OF 2006, ch. 4, § 13.

The WLAD defines places of public accommodation to include places maintained "for the sale of goods, merchandise, services, or personal property, or for the rendering of personal services . . . ." RCW 49.60.040(2). Protected individuals are guaranteed "[t]he right to the full enjoyment of any of the accommodations, advantages, facilities, or privileges" of such places. RCW 49.60.030(1)(b). Additionally, the WLAD states that "[t]he right to be free from discrimination *because of* . . . sexual orientation . . . is recognized as and declared to be a civil right," RCW 49.60.030(1) (emphasis added). The WLAD prohibits discrimination on the different basis of "marital status" in the employment context, but not in the context of public accommodations. *Compare* RCW 49.60.180 (listing "marital status" as a protected class in section governing unfair practices of employers), *with* RCW 49.60.215 (omitting marital status from analogous public accommodations statute).

RCW 49.60.030(2) authorizes private plaintiffs to bring suit for violations of the WLAD. To make out a prima facie case under the WLAD for discrimination in the public accommodations context, the plaintiff must establish four elements: (1)

29

that the plaintiff is a member of a protected class, RCW 49.60.030(1); (2) that the defendant is a place of public accommodation, RCW 49.60.215; (3) that the defendant discriminated against the plaintiff, whether directly or indirectly, *id.*; and (4) that the discrimination occurred "because of" the plaintiff's status or, in other words, that the protected status was a substantial factor causing the discrimination, RCW 49.60.030. *See also Fell v. Spokane Transit Auth.*, 128 Wn.2d 618, 637, 911 P.2d 1319 (1996) (setting forth elements of prima facie case for disability discrimination under RCW 49.60.215).

Stutzman contests only the last element: she contends that she did not discriminate against Ingersoll "because of" his protected class status under the WLAD. *See* Br. of Appellants at 19-21.[7] She offers three arguments in support of this interpretation of the statute.

First, Stutzman argues that if she discriminated against Ingersoll, it was on the basis of his "marital status," not his "sexual orientation." Br. of Appellants at 19-21. Second, she argues that the legislature could not have intended the 2006

---

[7] No one disputes that Ingersoll and Freed are gay men who sought to marry in recognition of their nearly nine-year committed relationship. And Stutzman admits that she is the "sole owner and operator of Arlene's Flowers, Inc.," CP at 535, which is "a Washington for-profit corporation engaged in the sale of goods and services, including flowers for weddings," to the public. *Id.* at 2, 7-8. Furthermore, Stutzman confirms that she declined to do the flowers for Ingersoll's wedding because of her religious convictions.

amendments to protect people seeking same-sex wedding services since same-sex marriages were "illegal" in Washington in 2006. *Id.* at 15-17. She points out that when the legislature amended the public accommodations provisions of the WLAD in 2006, it also added language stating that the chapter "shall not be construed to endorse any specific belief, practice, behavior, or orientation" and affirming that the addition "shall not be construed to modify or supersede state law relating to marriage." *Id.* at 17-18, 15 (quoting LAWS OF 2006, ch. 4, § 2 (codified at RCW 49.60.020)). Third, Stutzman argues that because the WLAD protects both sexual orientation and religion, it requires that courts balance those rights when they conflict.[8] These arguments fail.

    i. By refusing to provide services for a same-sex wedding, Stutzman discriminated on the basis of "sexual orientation" under the WLAD

Stutzman argues that the WLAD distinguishes between discrimination on the basis of "sexual orientation"—which the statute prohibits—and discrimination against those who marry members of the same sex. But numerous courts—including our own—have rejected this kind of status/conduct distinction in cases involving

---

[8] Stutzman also argues that by compelling her to furnish flowers for a same-sex marriage ceremony, the State "endorses" same-sex marriages and also requires her to "endorse" them. Br. of Appellants at 18. She claims that this conflicts with the WLAD provision stating that "[t]his chapter shall not be construed to endorse any specific belief, practice, behavior, or orientation." RCW 49.60.020. But Stutzman cites no legal authority for this interpretation of the term "endorse" in the WLAD.

statutory and constitutional claims of discrimination. *E.g., Hegwine v. Longview Fibre Co.*, 162 Wn.2d 340, 349, 172 P.3d 688 (2007) ("under the plain language of the WLAD and its interpretative regulations, pregnancy related employment discrimination claims are matters of sex discrimination"); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, 309 P.3d 53 (rejecting argument identical to Stutzman's, in context of New Mexico's Human Rights Act (NMHRA), N.M. Stat. Ann. §§ 28-1-1 to 28-1-13);[9] *Christian Legal Soc'y Chapter of Univ. of Cal. v. Martinez*, 561 U.S. 661, 672, 688, 130 S. Ct. 2971, 177 L. Ed. 2d 838 (2010) (student organization was discriminating based on sexual orientation, not belief or conduct, when it excluded from membership any person who engaged in "'unrepentant homosexual conduct'"; thus, University's antidiscrimination policy did not violate First Amendment protections); *see also Lawrence v. Texas*, 539 U.S. 558, 575, 123 S. Ct. 2472, 156 L. Ed. 2d 508 (2003) (by criminalizing conduct typically undertaken

---

[9] In *Elane Photography*, the New Mexico Supreme Court addressed the question of whether a wedding photographer discriminated against a lesbian couple on the basis of their sexual orientation by refusing to photograph their wedding under a state public accommodations law similar to the WLAD. 309 P.3d 53. The proprietor of Elane Photography argued, much like Stutzman here, that she was not discriminating against Willock and her fiancée based on their sexual orientation, but rather was choosing not to "endorse" same-sex marriage by photographing one in conflict with her religious beliefs. *Id.* at 61. The court rejected Elane Photography's attempt to distinguish status from conduct, finding that "[t]o allow discrimination based on conduct so closely correlated with sexual orientation would severely undermine the purpose of the NMHRA." *Id.* Elane Photography was represented on appeal by the same organization—Alliance Defending Freedom—that represents Stutzman before this court. *Id.* at 58.

by gay people, a state discriminates against gay people in violation of protections under the Fourteenth Amendment to the federal constitution); *Romer v. Evans*, 517 U.S. 620, 641, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996) (Scalia, J., dissenting) ("'After all, there can hardly be more palpable discrimination against a class than making the conduct that defines the class criminal.'" (quoting *Padula v. Webster*, 261 U.S. App. D.C. 365, 371, 822 F.2d 97 (1987))); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993) (summarizing that some conduct is so linked to a particular group of people that targeting it can readily be interpreted as an attempt to disfavor that group by stating that "[a] tax on wearing yarmulkes is a tax on Jews");[10] *Bob Jones Univ. v. United States*, 461 U.S. 574, 605, 103 S. Ct. 2017, 76 L. Ed. 2d 157 (1983) ("discrimination

---

[10] Stutzman argues that *Bray* actually supports her position because the *Bray* Court rejected the argument that a group's antiabortion protests outside clinics reflected an "'invidiously discriminatory animus'" toward women in general. 506 U.S. at 269 (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)); Reply Br. of Appellants at 39. This is related to her argument in the opening brief on appeal that because she generally lacks animus toward gay people, and because her refusal to provide service to Mr. Ingersoll was motivated by religious beliefs, she cannot be said to have discriminated "because of" sexual orientation as required by the WLAD. *See* Br. of Appellants at 19-21. From *Bray*, Stutzman concludes that her decision to decline Mr. Ingersoll's "artistic commission" was acceptable because it was "reasonable" and she bore "no underlying animus" toward gay people in general. Reply Br. of Appellants at 40. However, *Bray* dealt with a question of statutory interpretation of 42 U.S.C. § 1985(3), which has been interpreted to require a showing of animus. *See Bray*, 506 U.S. at 267-68; *Griffin*, 403 U.S. at 102. In contrast, we have already addressed this question of an animus requirement with regard to the WLAD and have held that it contains no such requirement (see discussion below).

on the basis of racial affiliation and association is a form of racial discrimination").[11] Finally, in 2015, the Supreme Court likened the denial of marriage equality to same-sex couples itself to discrimination, noting that such denial "works a grave and continuing harm," and is a "disability on gays and lesbians [that] serves to disrespect and subordinate them." *Obergefell v. Hodges*, __ U.S. __, 135 S. Ct. 2584, 2604, 2607-08, 192 L. Ed. 2d 609 (2015) (fundamental right to marry includes same-sex couples and is protected by due process and equal protection clauses of Fourteenth Amendment; abrogating the equal protection and due process holdings in *Andersen v. King County*, 158 Wn.2d 1, 30, 138 P.3d 963 (2006) (plurality opinion) to the contrary).[12]

In accordance with this precedent, we reject Stutzman's proposed distinction between status and conduct fundamentally linked to that status. This is consistent with the language of the WLAD itself, which, as respondents observe, states that it is to be construed liberally, RCW 49.60.020; that all people, regardless of sexual orientation are to have "*full enjoyment* of any of the accommodations, advantages,

---

[11] *See also Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 258-59, 375 P.3d 1076 (2016) (discrimination on basis of race occurs even where racially motivated staffing decision might have been based on benign reason).

[12] In response to the authority cited here, Stutzman cites two cases for the proposition that other courts have drawn a distinction between conduct and status. *See* Reply Br. of Appellants at 36-37. She draws our attention to two trial court decisions from Kentucky and Virginia. *Id.*

facilities, or privileges" of any place of public accommodation, RCW 49.60.030(1)(b) (emphasis added); and that *all* discriminatory acts, including any act "which directly *or indirectly* results in any distinction, restriction, or discrimination" based on a person's sexual orientation is an unfair practice in violation of the WLAD, RCW 49.60.215(1) (emphasis added).

> ii. There is no same-sex wedding exception to the WLAD's public accommodation provision, RCW 49.60.215

For the reasons given in Section IV.A.i above, the plain language of RCW 49.60.215 prohibits Stutzman's refusal to provide same-sex wedding services to Ingersoll; such refusal constitutes discrimination on the basis of "sexual orientation," in violation of RCW 49.60.215. The same analysis applies to her corporation.

Stutzman asks us to read an implied same-sex wedding exception into this statute. She argues that the legislature could not have intended to require equal access to public accommodations for same-sex wedding services because when it amended RCW 49.60.215 to prohibit sexual orientation discrimination, same-sex marriage was "illegal" in Washington.

We reject this argument for two reasons. First, the WLAD already contains an *express* exemption to RCW 49.60.215 for "religious organization[s]"[13] that object

---

[13] This exemption does not extend to Arlene's Flowers, which does not meet the WLAD's definition of a "religious organization." RCW 26.04.010(7)(b) (defining

to providing public accommodations for same-sex weddings. LAWS OF 2012, ch. 3, § 1(5) ("[n]o religious organization is required to provide accommodations, facilities, advantages, privileges, services, or goods related to the solemnization or celebration of a marriage" (formatting omitted)). If the WLAD *already* excluded same-sex wedding services from the public accommodations covered under RCW 49.60.215, this exemption would be superfluous. We interpret statutes to avoid such superfluity whenever possible. *Rivard v. State,* 168 Wn.2d 775, 783, 231 P.3d 186 (2010) (in giving meaning to ambiguous statutory provisions, "we interpret a statute to give effect to all language, so as to render no portion meaningless or superfluous").

Second, for purposes of the analysis Stutzman would like us to adopt, same-sex marriage has never been "illegal" in Washington. Stutzman cites our decision in *Waggoner v. Ace Hardware Corp.,* 134 Wn.2d 748, 750, 953 P.2d 88 (1998), which rejected a claim of marital status discrimination by two people terminated from their jobs for cohabiting in contravention of their workplace antinepotism policy. Waggoner argued that "cohabitation" fit within the meaning of the term "marital status." In examining this question of statutory interpretation, we

---

"religious organization" to include "entities whose principal purpose is the study, practice, or advancement of religion," such as "churches, mosques, synagogues, temples," etc.).

36

determined that the plain meaning of the word "marital"—that is, pertaining to "the status of being married, separated, divorced, or widowed"—was sufficient to resolve the question against petitioners. *Id.* at 753. We thus rejected Waggoner's argument because "[w]e presume legislative consistency when called upon to construe statutory enactments or new amendments to old ones" and our legislature had criminalized cohabitation prior to protecting marital status under the WLAD. *Id.* at 754. Of significance here, we noted that cohabitation remained a *crime* for a full three years after marital status was included as a protected status, and observed that "[i]t would be most anomalous for the Legislature to *criminalize* and protect the same conduct at the same time." *Id.* (emphasis added). Stutzman argues that we should treat same-sex marriage the same way and hold that the legislature could not possibly have intended to protect that *practice* when it protected sexual orientation as a *status*.

But Stutzman's reliance on *Waggoner* is misplaced. Washington's Defense of Marriage Act did not criminalize same-sex marriage. Former RCW 9.79.120 (1973), *repealed by* LAWS OF 1975, 1st Ex. Sess., ch. 260, § 9A.92.010(211). Rather, it codified, as a matter of state law, that the only legally *recognized* marriages in the state of Washington were those between a man and a woman. *See* LAWS OF 1998, ch. 1, § 2 ("It is the intent of the legislature . . . to establish public policy against same-sex marriage in statutory law that clearly and definitively declares same-sex

marriages will not be recognized in Washington."). Former RCW 26.04.010 (1998) enacted no criminal penalties for attempts by two individuals of the same sex to wed; those individuals would simply not have had a valid "marriage" under Washington law. *See* LAWS OF 1998, ch. 1, § 3. Former RCW 9.79.120, on the other hand, specified that cohabitation was "a gross misdemeanor." *Waggoner*, 134 Wn.2d at 754 n.4. Our reasoning in *Waggoner* turned on the presence of a criminal statute targeting the conduct at issue, which is absent here.

We hold that there is no same-sex wedding exception to the WLAD's public accommodations provisions.

    iii. The WLAD contains no mandate to balance religious rights against the rights of protected class members

In her final statutory argument regarding the WLAD, Stutzman contends that the superior court erred by failing to balance her right to religious free exercise against Ingersoll's right to equal service. Stutzman argues that because the WLAD also protects patrons of public accommodations from discrimination based on "creed," RCW 49.60.030(1), and because this court has recognized that the WLAD "sets forth a *nonexclusive* list of rights," *Marquis v. City of Spokane*, 130 Wn.2d 97, 107, 922 P.2d 43 (1996), the statute actually grants conflicting rights. As a consequence, she argues, courts should conduct a balancing inquiry "on a case-by-case basis," Reply Br. of Appellants at 43. She cites *Seattle Times Co. v. Ishikawa,*

97 Wn.2d 30, 37-39, 640 P.2d 716 (1982), for the rule that this court uses balancing tests to resolve claims of competing rights in other contexts.[14]

But Stutzman cites no authority for her contention that the WLAD protects proprietors of public accommodations to the same extent as it protects their patrons, nor for her contention that a balancing test should be adopted for the WLAD. And, to the extent that Stutzman relies on *Ishikawa*, that case is inapposite: it dealt with two competing rights—the right to a fair trial and the right to open courts—*both* of which are *constitutional*, not statutory. *Id.* at 37.

When faced with a question of statutory interpretation, we "'must not add words where the legislature has chosen not to include them.'" *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010) (quoting *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003)). Here, the legislature has provided no indication in the text of the WLAD that it intended to

---

[14] Although Stutzman refers to the balancing test set forth in *Ishikawa*, that is not the test that she applies in her briefing. Instead, Stutzman articulates a three-part balancing inquiry that (1) prioritizes "[r]ights of express constitutional magnitude . . . over other rights when they conflict," (2) evaluates whether infringement on the rights of the opposing party are narrowly tailored to protect the rights of the claimant, and (3) weighs the benefits and burdens on each party. Br. of Appellants at 23-24. In conducting this inquiry, Stutzman concludes that her rights "should take precedence" here because they are of constitutional magnitude, rather than derived from police power as are Ingersoll's; the exception for weddings only (as opposed to refusal to serve the gay community for any purpose) is narrowly tailored to protect her religious rights; and she is more significantly burdened in that she is forced to choose between losing business or violating her religious beliefs, whereas "Mr. Ingersoll and Mr. Freed are able to obtain custom floral designs for their same-sex wedding from nearby florists." *Id.*

import a fact-specific, case-by-case, constitutional balancing test into the statute. Moreover, the plain terms of the WLAD's public accommodations provision—the statute at issue here—protect patrons, not business owners. In other regulatory contexts, this court and the United States Supreme Court have held that individuals who engage in commerce necessarily accept some limitations on their conduct as a result. *See United States v. Lee*, 455 U.S. 252, 261, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982) (Stevens, J., concurring in judgment) (declining to extend Social Security exemption to Amish employers on religious grounds because "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity"); *Backlund v. Bd. of Comm'rs of King County Hosp. Dist. No. 2*, 106 Wn.2d 632, 648, 724 P.2d 981 (1986) (rejecting religious grounds as valid basis for physician to decline liability insurance because "[t]hose who enter into a profession as a matter of choice, necessarily face regulation as to their own conduct"); *In re Marriage of Didier*, 134 Wn. App. 490, 499, 140 P.3d 607 (2006).

Because it is inconsistent with the WLAD's plain terms and unsupported by any precedent, we decline to adopt Stutzman's proposed balancing test. In sum,

Stutzman's refusal to provide custom floral arrangements for a same-sex wedding violated the WLAD's prohibition on discrimination in public accommodations.[15]

### B. Stutzman Fails To Show That the WLAD, as Applied in This Case, Violates Her State or Federal Constitutional Right to Free Speech

As noted above, Stutzman raises five constitutional challenges to the WLAD as applied to her. She is correct that if the State statute violated a constitutional right, the constitutional right would certainly prevail. U.S. CONST. art. VI, cl. 2 (federal constitutional supremacy); *Davis v. Cox*, 183 Wn.2d 269, 294-95, 351 P.3d 862 (2015) (state constitutional provision prevails over state statute to the contrary). We therefore analyze each of Stutzman's constitutional defenses carefully.

The first of these defenses is a free speech challenge: Stutzman contends that her floral arrangements are artistic expressions protected by the state and federal constitutions and that the WLAD impermissibly compels her to speak in favor of same-sex marriage.

> i. As applied to Stutzman in this case, the WLAD does not violate First Amendment speech protections

"Free speech is revered as the 'Constitution's most majestic guarantee,' central to the preservation of all other rights." *State ex rel. Pub. Disclosure Comm'n*

---

[15] To the extent Stutzman argues that her religious free exercise rights supersede Ingersoll's and Freed's statutory protections, we address that argument in the constitutional analyses below.

*v. 119 Vote No! Comm.*, 135 Wn.2d 618, 624, 957 P.2d 691 (1998) (plurality opinion) (quoting *Nelson v. McClatchy Newspapers, Inc.*, 131 Wn.2d 523, 536, 936 P.2d 1123 (1997)). "The government may not prohibit the dissemination of ideas that it disfavors, nor compel the endorsement of ideas that it approves." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 309, 132 S. Ct. 2277, 183 L. Ed. 2d 281 (2012). Indeed, the First Amendment protects even hate speech, provided it is not "fighting words" or a "'true threat.'" *Virginia v. Black*, 538 U.S. 343, 359, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003) (quoting *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969) (per curiam)).

Stutzman argues that the WLAD, as applied to her in this case, violates First Amendment protections against "compelled speech" because it forces her to endorse same-sex marriage. Br. of Appellants at 24-31. To succeed in this argument, she must first demonstrate that the conduct at issue here—her commercial sale of floral wedding arrangements—amounts to "expression" protected by the First Amendment. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984) ("[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive.").

She fails to meet this burden. The First Amendment's plain terms protect "speech," not conduct. U.S. CONST. amend. I ("Congress shall make no law . . . abridging the freedom of speech."). But the line between speech and conduct in this context is not always clear. Stutzman contends that her floral arrangements are "speech" for purposes of First Amendment protections because they involve her artistic decisions. Br. of Appellants at 24. Relying on the dictionary definition of "art," as well as expert testimony regarding her creativity and expressive style, she argues for a broad reading of protected speech that encompasses her "unique expression," crafted in "petal, leaf, and loam." *Id.* at 25-26. Ingersoll and the State counter that Stutzman's arrangements are simply one facet of conduct—selling goods and services for weddings in the commercial marketplace—that does not implicate First Amendment protections at all.

We agree that the regulated activity at issue in this case—Stutzman's sale of wedding floral arrangements—is not "speech" in a literal sense and is thus properly characterized as conduct. But that does not end our inquiry. The Supreme Court has protected conduct *as* speech if two conditions are met: "[(1)] [a]n intent to convey a particularized message was present, and [(2)] in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." *Spence v. Washington*, 418 U.S. 405, 410-11, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (1974) (per curiam). Recent cases have characterized this as an

43

inquiry into whether the conduct at issue was "inherently expressive." *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc. (FAIR)*, 547 U.S. 47, 64, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006).

Stutzman's floral arrangements do not meet this definition. Certainly, she argues that she *intends* to communicate a message through her floral arrangements. But the major contest is over whether Stutzman's intended communications actually communicated something to the public at large—whether her conduct was "inherently expressive." *Spence*, 418 U.S. at 410-11; *FAIR*, 547 U.S. at 64. And her actions in creating floral arrangements for wedding ceremonies do not satisfy this standard.

The leading case on the "inherently expressive" standard is *FAIR*. The plaintiffs in *FAIR*—an association of law schools and faculty members—challenged the constitutionality of a law that required higher education institutions to provide military recruiters on campus with access to facilities and students that was at least equivalent to that of the most favorably treated nonmilitary recruiter. 547 U.S. at 52, 55. The *FAIR* Court ruled that the law schools' conduct in denying military recruiters most-favorable-recruiter access to students was *not* protected by the First Amendment because it was not "inherently expressive." *Id.* at 66. It explained that additional speech would be required for an outside observer to understand that the

schools' reason for denying military recruiters favorable access was to protest the military's "Don't Ask, Don't Tell" policy. *Id.*

Stutzman's refusal is analogous. The decision to either provide or refuse to provide flowers for a wedding does not inherently express a message about that wedding. As Stutzman acknowledged at deposition, providing flowers for a wedding between Muslims would not necessarily constitute an endorsement of Islam, nor would providing flowers for an atheist couple endorse atheism. Stutzman also testified that she has previously declined wedding business on "[m]ajor holidays, when we don't have the staff or if they want particular flowers that we can't get in the time frame they need." CP at 120. Accordingly, an outside observer may be left to wonder whether a wedding was declined for one of at least three reasons: a religious objection, insufficient staff, or insufficient stock.

Stutzman argues that *FAIR* is inapposite and that we should instead apply *Hurley*. *Hurley* held that a state antidiscrimination law could not be applied so as to require a private parade to include marchers displaying a gay pride message. 515 U.S. at 568. Stutzman claims *Hurley* recognizes her First Amendment right "to exclude a message [she] did not like from the communication [she] chose to make." Reply Br. of Appellants at 11 (citing *Hurley*, 515 U.S. at 574).[16]

---

[16] Stutzman relies on *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988), in which the Boston Symphony (BSO) refused to perform with Vanessa

*Hurley* is similar to this case in one respect: it involved a public accommodations law like the WLAD.[17] But the Massachusetts trial court had ruled that the *parade itself* was a place of public accommodation under state antidiscrimination law—a ruling that the Supreme Court called "peculiar." 515 U.S. at 561-62, 572. The Court noted that the parade's "inherent expressiveness"

---

Redgrave in light of her support of the Palestine Liberation Organization. Redgrave sued the BSO for breach of contract and consequential damages in federal court. *Redgrave v. Boston Symphony Orchestra, Inc.*, 602 F. Supp. 1189 (D. Mass. 1985), *aff'd in part, vacated in part*, 855 F.2d 888. The First Amendment issue in that case arose from the district court's concern that Redgrave's novel theory of consequential damages was sufficiently related to defamation cases so as to implicate First Amendment concerns. *Id.* at 1201.

However, as the attorney general here notes, the First Circuit resolved that case on statutory interpretation of the Massachusetts Civil Rights Act, MASS. GEN. LAWS ch. 12, §§ 11H-11J, not on First Amendment grounds. Att'y Gen.'s Resp. Br. at 26. In fact, the court ultimately chose to "decline to reach the federal constitutional issues," given the complex interaction between First Amendment doctrine and state law, and saw "no need to discuss the existence or content of a First Amendment right not to perform an artistic endeavor." *Redgrave*, 855 F.2d at 911. Accordingly, Stutzman's references are, at best, out-of-circuit dicta.

[17] Stutzman cites both *Hurley* and *Boy Scouts of America v. Dale*, 530 U.S. 640, 657, 120 S. Ct. 2446, 147 L. Ed. 2d 554 (2000), as examples of cases in which the Supreme Court vindicated First Amendment rights over state antidiscrimination public accommodations laws. In fact, both cases involved state courts applying public accommodations laws in unusually expansive ways, such that an individual, private, expressive association of people fell under the law. *Dale*, 530 U.S. at 657 (New Jersey Court "went a step further" from an already "extremely broad" public accommodations law in applying it "to a private entity without even attempting to tie the term 'place' to a physical location"); *Hurley*, 515 U.S. at 572 (noting that Massachusetts trial court applied a public accommodations law "in a peculiar way" to encompass a privately sponsored parade). This case is distinguishable because Arlene's Flowers is a paradigmatic public accommodation.

distinguished it from the places traditionally subject to public accommodations laws—places that provide "publicly available goods, privileges, and services." *Id.* at 568-72. *Hurley* is therefore unavailing to Stutzman: her store is the kind of public accommodation that has traditionally been subject to antidiscrimination laws. *See Elane Photography*, 309 P.3d at 68 (rejecting photographer's reliance on *Hurley* because state antidiscrimination law applies not to defendant's photographs but to "its business decision not to offer its services to protected classes of people"; concluding that "[w]hile photography may be expressive, the operation of a photography business is not").[18]

United States Supreme Court decisions that accord free speech protections to conduct under the First Amendment have all dealt with conduct that is clearly expressive, in and of itself, without further explanation. *See Hurley*, 515 U.S. at 568 (parades); *United States v. Eichman*, 496 U.S. 310, 110 S. Ct. 2404, 110 L. Ed. 2d 287 (1990) (burning the American flag); *Texas v. Johnson*, 491 U.S. 397, 109 S. Ct.

---

[18] The Supreme Court has drawn this distinction between expressive conduct and commercial activity in the context of First Amendment freedom of association claims, and likewise rejected the notion that the First Amendment precludes enforcement of antidiscrimination public accommodations laws in that context as well. *E.g., Dale*, 530 U.S. at 657 (distinguishing between "clearly commercial entities" and "membership organizations" in cases involving the intersection between state public accommodations laws and First Amendment rights); *Roberts v. U.S. Jaycees*, 468 U.S. 609, 627, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984) (finding that even private membership organizations may be regulated by public accommodations laws where such regulations will not impair its ability "to disseminate its preferred views" and holding that there was no such impairment where young men's social organization was required to accept women members).

2533, 105 L. Ed. 2d 342 (1989) (burning the American flag); *United States v. Grace,* 461 U.S. 171, 103 S. Ct. 1702, 75 L. Ed. 2d 736 (1983) (distributing leaflets outside Supreme Court building in violation of federal statute); *Nat'l Socialist Party of Am. v. Village of Skokie,* 432 U.S. 43, 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977) (per curiam) ("'[m]arching, walking or parading'" while wearing Nazi uniforms (alteration in original)); *Smith v. Goguen,* 415 U.S. 566, 588, 94 S. Ct. 1242, 39 L. Ed. 2d 605 (1974) (White, J., concurring in judgment) (treating flag "'contemptuously'" by wearing a small American flag sewn into the seat of one's pants); *Wooley v. Maynard,* 430 U.S. 705, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977) (state motto on license plates); *Spence,* 418 U.S. 405, 94 S. Ct. 2727, 41 L. Ed. 2d 842 (displaying American flag upside down on private property with peace sign superimposed on it to express feelings about Cambodian invasion and Kent State University shootings); *Cohen v. California,* 403 U.S. 15, 16, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971) (wearing jacket emblazoned with the words "'F**k the Draft'"); *Schacht v. United States,* 398 U.S. 58, 90 S. Ct. 1555, 26 L. Ed. 2d 44 (1970) (wearing army uniform in short play criticizing United States involvement in Vietnam, inasmuch as it does not tend to discredit the armed forces); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 505, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969) (wearing black armbands to protest Vietnam conflict); *Brown v. Louisiana,* 383 U.S. 131, 141-42, 86 S. Ct. 719, 15 L. Ed. 2d 637 (1966) (sit-in to protest "whites

only" area in public library during civil rights struggle); *Cox v. Louisiana*, 379 U.S. 536, 552, 85 S. Ct. 453, 13 L. Ed. 2d 471 (1965) (giving speech and leading group of protesters in song and prayer in opposition to segregation); *Edwards v. South Carolina*, 372 U.S. 229, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963) (peaceful march on sidewalk around State House grounds in protest of discrimination); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943) (refusing to salute the American flag while saying pledge of allegiance); *Stromberg v. California*, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed. 1117 (1931) (peaceful display of red flag as a sign of opposition to organized government). Stutzman's conduct—whether it is characterized as creating floral arrangements, providing floral arrangement services for opposite-sex weddings, or denying those services for same-sex weddings—is not like the inherently expressive activities at issue in these cases. Instead, it is like the unprotected conduct in *FAIR*, 547 U.S. at 66.[19]

---

[19] Stutzman and amici point to a handful of cases protecting various forms of art—and some of them do seem to provide surface support for their argument. *See* Br. of Appellants at 6-7; Mot. for Leave to File Br. & Br. for Cato Inst. as Amicus Curiae in Supp. of Appellants (Cato) at 7 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 790-91, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989) (music without words); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557-58, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) (theater); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (tattooing); *Piarowski v. Ill. Cmty. Coll. Dist. 515*, 759 F.2d 625, 627-28 (7th Cir. 1985) (stained glass windows on display in an art gallery at a junior college)).

But, on closer examination, those cases do not expand the definition of "expressive conduct." For example, *Piarowski* held that stained glass windows were protected in the context of a college's demands that the artist move some of his pieces from a gallery to an

Finally, Stutzman asserts that even if her case doesn't fall neatly within the contours of these prior holdings, we should nevertheless place her floral artistry within a new, narrow protection. The "narrow" exception she requests would apply to "businesses, such as newspapers, publicists, speechwriters, photographers, and other artists, that create expression as opposed to gift items, raw products, or prearranged [items]." Reply Br. of Appellants at 45. In her case, she proposes that she would be willing to sell Mr. Ingersoll "uncut flowers and premade arrangements." Id. at 46. But, as amicus Americans United for Separation of Church and State points out, Stutzman's rule would create a "two-tiered system" that carves out an enormous hole from public accommodations laws: under such a system, a "dime-store lunch counter would be required to serve interracial couples but an upscale bistro could turn them away." Br. of Amicus Curiae Ams. United in Supp. of Resp'ts at 13. Indeed, the New Mexico Supreme Court also grappled with this question, ultimately finding that "[c]ourts cannot be in the business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws," and noting that this concern was hardly hypothetical in

_____

alternate location on campus because they were objected to as "sexually explicit and racially offensive." 759 F.2d at 632. And the Anderson court reached its finding that tattoos receive First Amendment protections by pointing out that they "are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection." 621 F.3d at 1061. Stutzman's floral arrangements do not implicate any similar concerns.

light of the proliferation of cases requesting exceptions for "florists, bakeries, and other wedding vendors" who refused to serve gay couples. *Elane Photography*, 309 P.3d at 71.

Because Stutzman's sale of floral arrangements is not expressive conduct protected by the First Amendment, we affirm the trial court and hold that the WLAD does not violate free speech protections as applied to Stutzman in this case.

> ii. Stutzman does not argue that article I, section 5 of the Washington Constitution provides any greater protection than the First Amendment in this context; we therefore affirm the trial court's ruling that no article I, section 5 violation occurred in this case

Stutzman asserts violations of both state and federal free speech constitutional provisions, though she does not distinguish between them.

As the superior court correctly points out, we interpret article I, section 5 independently from the First Amendment. *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 800, 231 P.3d 166 (2010). In some cases, we have found article I, section 5 to be more protective than its federal counterpart, and in some cases, we have held the two to contain equivalent protections. *Id.* In this case, however, Stutzman has not assigned error to the superior court's use of a First Amendment analysis rather than a separate state constitutional analysis. We therefore decline to reach the issue of whether article I, section 5 rights in this context are coextensive with First Amendment rights.

51

C. As Applied in This Case, the WLAD Does Not Violate Stutzman's Right to Religious Free Exercise under the First Amendment to the United States Constitution

In her second constitutional claim, Stutzman argues that the WLAD, as applied to her in this case, violated her First Amendment right to religious free exercise. We disagree.

The free exercise clause of the First Amendment, which applies to the States through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S. Ct. 900, 84 L. Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." Laws that burden religion are subject to two different levels of scrutiny under the free exercise clause. Neutral, generally applicable laws burdening religion are subject to rational basis review,[20] while laws that discriminate against some or all religions (or regulate conduct *because* it is undertaken for religious reasons) are subject to strict scrutiny.[21]

Stutzman argues that the WLAD is subject to strict scrutiny under a First Amendment free exercise analysis because it is neither neutral nor generally applicable. She is incorrect.

---

[20] *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990).

[21] *Lukumi Babalu Aye*, 508 U.S. at 532.

A law is not neutral for purposes of a First Amendment free exercise challenge if "the object of [the] law is to infringe upon or restrict practices *because* of their religious motivation." *Lukumi Babalu Aye*, 508 U.S. at 533 (emphasis added). Stutzman does not argue that our legislature passed the WLAD in order to target religious people or people whose religions dictate opposition to gay marriage. Instead, she argues that the WLAD is unfair because it grants exemptions for "religious organizations"[22]—permitting these organizations to refuse marriage services—but does not extend those same exemptions to her. Br. of Appellants at 37.

We disagree. The cases on which Stutzman relies all address laws that single out for onerous regulation either religious conduct in general or conduct linked to a particular religion, while exempting secular conduct or conduct associated with other, nontargeted religions. *E.g.*, *Lukumi Babalu Aye*, 508 U.S. at 532-42 (law was not neutral where legislative history, including enactment of numerous exemptions for members of other religions, evidenced a clear intent to target practitioners of

---

[22] *See* RCW 26.04.010(6) ("A religious organization shall be immune from any civil claim or cause of action, including a claim pursuant to chapter 49.60 RCW, based on its refusal to provide accommodations, facilities, advantages, privileges, services, or goods related to the solemnization or celebration of a marriage."). "Religious organization" is defined as including, "but . . . not limited to, churches, mosques, synagogues, temples, nondenominational ministries, interdenominational and ecumenical organizations, mission organizations, faith-based social agencies, and other entities whose principal purpose is the study, practice, or advancement of religion." RCW 26.04.010(7)(b).

Santeria faith). They recognize that the "[t]he Free Exercise Clause forbids any regulation of beliefs as such," and that this unconstitutional regulation may sometimes be accomplished through a law that *appears* facially neutral. *Blackhawk v. Pennsylvania*, 381 F.3d 202, 208-09 (3d Cir. 2004). But blanket exemptions for religious organizations do not evidence an intent to target religion. Instead, they indicate the opposite. *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335-38, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987) (exemption in Civil Rights Act of 1964, 42 U.S.C. § 2000e, for religious organizations does not violate the establishment clause because it serves a secular purpose—to minimize governmental interference with religion—and neither advances nor inhibits religion); *Elane Photography*, 309 P.3d at 74-75 ("Exemptions for religious organizations are common in a wide variety of laws, and they reflect the attempts of the Legislature to respect free exercise rights by reducing legal burdens on religion.").

Stutzman also argues that the WLAD is not "generally applicable" because it does not apply to businesses that employ fewer than eight persons, employees working for a close family member or in domestic service, people renting out certain multifamily dwellings, and distinctly private organizations.

Again, the authority Stutzman cites is inapposite. That authority stands for two principles, neither of which is implicated here.

54

First, a law may fail the "general applicability" test, and thus trigger strict scrutiny, if it adopts a patchwork of specific exemptions that conspicuously omits certain religiously motivated conduct. As with nonneutral laws, such an omission is evidence that the government has deliberately targeted religious conduct for onerous regulation, or at the very least devalued religion as a ground for exemption. *Lukumi Babalu Aye*, 508 U.S. at 544-46 (holding that ordinance was not generally applicable because it "pursues the city's governmental interests *only* against conduct motivated by religious belief" (emphasis added)); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365-66 (3d Cir. 1999) (police department policy prohibiting officers from wearing beards triggered strict scrutiny because it allowed individual exemptions for medical but not religious reasons; because the medical exemption undermined the policy's purpose—to create uniformity of appearance among its officers—just as much as a religious exemption would, the disparity evidenced the department's preference for medical (secular) objections over religious ones).

Second, a law is not "generally applicable" if it permits individual exemptions but is then applied in a manner that is needlessly prejudicial to religion. *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007) ("What makes a system of individualized exemptions suspicious is the possibility that certain violations may be condoned when they occur for secular reasons but not

when they occur for religious reasons. In *Blackhawk*, it was not the mere existence of an exemption procedure that gave us pause but rather the fact that the Commonwealth could not coherently explain what, other than the religious *motivation* of Blackhawk's conduct, justified the unavailability of an exemption." (citing *Blackhawk*, 381 F.3d at 211)).

In this case, Stutzman seeks an exemption that would allow her to refuse certain customer services to members of a WLAD-protected class on religious grounds. Under a First Amendment free exercise analysis, the WLAD would trigger strict scrutiny if it permitted that sort of discrimination only for nonreligious reasons, and thus indicated the government's preference for secular discrimination. But the WLAD does not do this.

Three of the alleged "exemptions" Stutzman cites have nothing at all to do with the exemption she seeks (an exemption permitting discrimination in public accommodations). The exemption for "[people] renting [out] certain multifamily dwellings," Br. of Appellants at 38 (citing RCW 49.60.040(5)), is not really an exemption from the WLAD at all. RCW 49.60.040(5) defines a "covered multifamily dwelling" to exclude all buildings with fewer than four units and certain buildings with no elevators. In conjunction with RCW 49.60.222(2)(c), this provision requires that "covered multifamily dwellings" be designed and constructed in compliance with state and federal disability access laws. This is not a license for

certain landlords to discriminate. With respect to public accommodations, the same is true of the WLAD's "exemptions" for individuals employed in domestic service or by family members and for "employers" with fewer than eight employees. *See* Br. of Appellants at 38 (citing RCW 49.60.040(10), (11)). These exemptions protect *employers* from WLAD liability *as employers*—that is, liability to their employees—in the context of family relationships, domestic service, and very small businesses; they have nothing to do with Stutzman's liability as the proprietor of a public accommodation. *Compare* RCW 49.60.180 (listing prohibited "[u]nfair practices of employers," all of which discriminate against employees or potential employees—not customers), *with* RCW 49.60.215 (listing prohibited "[u]nfair practices of places of public resort, accommodation, assemblage, amusement"; completely omitting any reference to "employers"). Thus, these exemptions are distinguishable from the exemptions at issue in *Lukumi Babalu Aye*, *Blackhawk*, or *Fraternal Order of Police* because none is an exemption that Stutzman would actually like to invoke.

And the other "exemption" Stutzman identifies—for distinctly private organizations, Br. of Appellants at 38 (citing RCW 49.60.040(2))—does not undermine the purposes of the WLAD's public accommodations provision: to prevent discrimination in *public* accommodations. Thus, it does not trigger strict scrutiny under a First Amendment free exercise analysis either. *Fraternal Order of*

57

*Police*, 170 F.3d at 366 (contrasting exemptions that undermine a law's purpose—and thus trigger strict scrutiny—with exemptions for "activities that [the government] does not have an interest in preventing"; holding that police department's exemption permitting undercover officers to wear beards did not trigger strict scrutiny because the governmental interest served by the shaving requirement—making officers readily recognizable as officers—did not apply to undercover officers).

For these reasons, we reject Stutzman's claim that the WLAD, as applied to her, triggers strict scrutiny under the free exercise clause of the First Amendment. The WLAD is a neutral, generally applicable law subject to rational basis review. *Emp't Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). And the WLAD clearly meets that standard: it is rationally related to the government's legitimate interest in ensuring equal access to public accommodations. *See Lighthouse*, 510 F.3d at 277 (to withstand free exercise challenge, neutral, generally applicable law "must be reasonable and not arbitrary and it must bear 'a rational relationship to a [permissible] state objective'" (alteration in original) (quoting *Belle Terre v. Boraas*, 416 U.S. 1, 8, 94 S. Ct. 1536, 39 L. Ed. 2d 797 (1974))).

D. As Applied in This Case, the WLAD Did Not Violate Stutzman's Right to Religious Free Exercise under Article I, Section 11 of the Washington Constitution

    i. This court has applied strict judicial scrutiny to certain article I, section 11 claims

Stutzman also raises a state constitutional challenge to the WLAD as applied to her religiously motivated conduct in this case. Article I, section 11 of the Washington Constitution provides, in relevant part:

> Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state.

Obviously, this language differs from the language of the First Amendment's free exercise clause.

In the past, however, we interpreted article I, section 11 to provide the same protection as the First Amendment's free exercise clause. *See First Covenant Church of Seattle v. City of Seattle*, 114 Wn.2d 392, 402, 787 P.2d 1352 (1990) (*First Covenant* I), *vacated and remanded*, 499 U.S. 901, 111 S. Ct. 1097, 113 L. Ed. 2d 208 (1991). Thus, for many years this court relied on First Amendment free exercise case law in article I, section 11 challenges and applied strict scrutiny to laws burdening religion. *Id.* (law burdening religion must serve "compelling state

interest" and "constitute[] the least restrictive means to achieve the government's

objective" (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. Ed. 2d 965

(1963); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972);

*Hobbie v. Unemployment Appeals Comm'n*, 480 U.S. 136, 107 S. Ct. 1046, 94 L.

Ed. 2d 190 (1987))).[23]

In 1990, however, things changed. That was the year that the United States

Supreme Court adopted rational basis review for claims that neutral, generally

applicable laws (like the WLAD) incidentally burden religion in *Smith*, 494 U.S. at

878-90. *Smith* definitively repudiated strict scrutiny for neutral, generally applicable

laws prohibiting "socially harmful conduct." *Id.* at 884-85. It reasoned that applying

heightened scrutiny—which requires a balancing of governmental against personal

interests—would pose two problems. *Id.* First, it would vitiate the state's ability to

regulate, allowing every individual "'to become a law unto himself.'" *Id.* at 885

(quoting *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 167, 25 L. Ed. 244 (1878)).

---

[23] Some scholarship distinguishes between the "compelling interest" test and "strict scrutiny." *E.g.*, Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 AM. J. LEGAL HIST. 355, 359-60 (2008) (describing the "compelling interest" standard as one of three barriers that legislation must overcome under strict scrutiny). But this court has always treated them as synonymous in religious free exercise cases. *E.g.*, *Backlund*, 106 Wn.2d at 641 ("Since [the plaintiff's] beliefs are protected by the free exercise clause of the First Amendment, the burden of proof shifts to the Board to prove that (1) a compelling governmental interest justifies the regulation in question and (2) the regulation is the least restrictive imposition on the *practice* of his belief to satisfy that interest." (citing *United States v. Lee*, 455 U.S. 252, 257, 102 S. Ct. 1051, 71 L. Ed. 2d 127 (1982); *State v. Meacham*, 93 Wn.2d 735, 740, 612 P.2d 795 (1980))).

Second, it would entangle civil courts in religion by requiring them to evaluate the significance of a particular practice to a faith. *Id.* at 887 ("[r]epeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim"). The *Smith* Court reasoned that such a balancing test would be incompatible with the religious pluralism that is fundamental to our national identity. *Id.* at 888.

*Smith*'s holding is limited in two ways. First, it left in place prior First Amendment case law applying the "compelling interest" balancing test where the statute in question "lent itself to individualized . . . assessment"—e.g., an unemployment benefits statute under which an administrative court determines, on a case-by-case basis, whether a person was fired for good cause. *Id.* at 884. In such cases, the Court explained that "the State [already] has in place a system of individual exemptions"—thus, the challenged law is not "generally applicable" for purposes of First Amendment free exercise analysis. *Id.* Where an individual requests a religious exemption from such a law, the government must have a compelling reason for denying it. *Id.* Second, the *Smith* Court distinguished cases involving "hybrid" claims—e.g., challenges to laws that burdened *both* religious freedom *and* another right such as free speech. *Id.* at 881 (collecting cases).

We revisited our article I, section 11 test following *Smith* in *First Covenant Church of Seattle v. City of Seattle*, 120 Wn.2d 203, 840 P.2d 174 (1992) (*First*

*Covenant* II). In that case, the plaintiff church argued that its designation as a historical landmark (subject to "controls" limiting alterations to its building) violated both First Amendment and article I, section 11 protections. *Id.* at 208-09. In *First Covenant* I, we applied strict scrutiny to both constitutional challenges and held that the zoning law was unconstitutional. 114 Wn.2d at 401-02, 410. On remand from the United States Supreme Court following *Smith*, we addressed the state and federal free exercise claims again. Regarding the First Amendment claim, the *First Covenant* II court held that the challenged statute fell within both of the exceptions to rational basis review recognized in *Smith*: it created a system of "individualized assessments" *and* it raised "hybrid" constitutional concerns (by restricting speech as well as religious free exercise). 120 Wn.2d at 214-17. The court therefore held that the historical landmark statute was subject to strict scrutiny under the First Amendment. *Id.* at 217-18.

But after determining that the statute failed strict scrutiny as applied to the plaintiff church—because a city's purely aesthetic or cultural interest in preserving historical landmarks is not compelling—the *First Covenant* II court went on to separately analyze the church's article I, section 11 claim. *Id.* at 223 ("The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom . . . [and] [a]lthough we might . . . base our

decision solely on federal grounds, we decline to do so."). It performed a *Gunwall*[24] analysis and concluded that article I, section 11 "extends broader protection than the [F]irst [A]mendment . . . and precludes the City from imposing [the disputed] Landmarks Preservation Ordinance on First Covenant's church." *Id.* at 229-30.

Since that time, our court has addressed four article I, section 11 claims—all by churches challenging land use regulations[25]—and has subjected the challenged law to strict scrutiny in each case. Thus, both before and after *Smith* and *First Covenant* II, we have applied the same four-pronged analysis in an article I, section 11 challenge: where a party has (1) a sincere religious belief and (2) the exercise of that belief is substantially burdened by the challenged law, the law is enforceable against that party only if it (3) serves a compelling government interest and (4) is the least restrictive means of achieving that interest. *City of Woodinville v. Northshore United Church of Christ*, 166 Wn.2d 633, 642, 211 P.3d 406 (2009); *Backlund*, 106

---

[24] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986). A *Gunwall* analysis determines whether a state constitutional provision is more protective than its federal counterpart by considering six nonexclusive factors: (1) the text of the state constitutional provision at issue, (2) significant differences between the text of parallel state and federal constitutional provisions, (3) state constitutional and common law history, (4) state law predating the state constitution, (5) structural differences between the state and federal constitutions, and (6) matters of particular state or local concern. *Id.* at 61-62.

[25] *City of Woodinville v. Northshore United Church of Christ*, 166 Wn.2d 633, 644-45, 211 P.3d 406 (2009); *Open Door Baptist Church v. Clark County*, 140 Wn.2d 143, 156-60, 995 P.2d 33 (2000); *Munns v. Martin*, 131 Wn.2d 192, 195, 930 P.2d 318 (1997); *First United Methodist Church of Seattle v. Hr'g Exam'r for Seattle Landmarks Pres. Bd.*, 129 Wn.2d 238, 249-50, 252-53, 916 P.2d 374 (1996).

Wn.2d at 641. And we have specifically held—in the context of a church's challenge

to a zoning law—that article I, section 11 is more protective of religious free exercise

than the First Amendment is. *E.g.*, *First Covenant* II, 120 Wn.2d at 224 (applying

strict scrutiny to zoning ordinance as a matter of state constitutional law because

"[o]ur state constitutional and common law history support a broader reading of

article [I], section 11 than of the First Amendment").[26]

The parties dispute the significance of these post-*Smith* holdings to this case.

Ingersoll and the attorney general argue that they are limited to zoning laws, as

applied to churches, and thus make no difference to the outcome under our long-

standing, four-pronged test. They maintain that a neutral health and safety regulation

like the WLAD creates no substantial burden on the free exercise of religion—and

thus does not trigger strict scrutiny—when it operates in the commercial

---

[26] The attorney general correctly notes that this court has never held that a corporate defendant such as Arlene's Flowers has a "conscience" or "sentiment" subject to article I, section 11 protections. *See* Att'y Gen. Resp. Br. at 31 ("Indeed the plain language of article I, section 11 guarantees its protections to 'every individual,' making no mention of protection for businesses."); Att'y Gen.'s Answer to Brs. of Amici Curiae at 19 ("Neither Defendants nor their amici point to any Washington authority to support the notion that for-profit corporations are protected by article I, section 11."). But Stutzman argues only that she may assert her *own* free exercise rights on behalf of her corporation. Br. of Appellants at 32 n.24 ("'protecting the free-exercise rights of [closely held] corporations . . . protects the religious liberty *of the humans who own and control those companies*'" (emphasis added) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 707, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014))). Thus, we address only Stutzman's individual claim that *her* article I, section 11 rights have been violated. We do not address whether Arlene's Flowers (the corporation) has any such rights.

marketplace. Stutzman contends that under *First Covenant* II and its progeny, "strict scrutiny applies even if the regulation 'indirectly burdens the exercise of religion.'" Br. of Appellants at 33 (quoting *First Covenant* II, 120 Wn.2d at 226).

We decline to resolve that dispute here because we conclude that Stutzman's free exercise claim fails even under the test she advances. Even if article I, section 11 provides Stutzman with the strongest possible protections, subjecting the WLAD to strict scrutiny in this case, her state constitutional challenge must still fail.

### ii. The WLAD survives strict scrutiny

In the decades before *First Covenant* II, this court upheld numerous health and safety regulations under strict scrutiny—the test that we then assumed was required under the First Amendment. *E.g.*, *Backlund*, 106 Wn.2d at 641 (requirement that physician purchase professional liability insurance did not violate First Amendment; State had a compelling interest in licensure requirement and the requirement was "the least restrictive imposition on the *practice* of [the plaintiff's] belief to satisfy that interest"); *State v. Meacham*, 93 Wn.2d 735, 740-41, 612 P.2d 795 (1980) (court-ordered blood test for putative fathers did not violate First Amendment; State had a compelling interest in securing child support and that interest could not "be achieved by measures less drastic"); *State ex rel. Holcomb v. Armstrong*, 39 Wn.2d 860, 861, 863-64, 239 P.2d 545 (1952) (neither First Amendment nor prior version of article I, section 11 barred mandatory tuberculosis

testing as condition of admission to University of Washington; "the public interest [served] is the health of all of the students and employees of the university[;] . . . [t]he danger to this interest is clear and present, grave and immediate[, and] . . . [i]nfringement of appellant's rights is a necessary consequence of a practical attempt to avoid the danger"); *see also State v. Clifford*, 57 Wn. App. 127, 132-34, 787 P.2d 571 (1990) (law mandating that drivers be licensed does not violate First Amendment; "[t]here is no less restrictive means available to satisfy the State's compelling interest in regulating the driving of motor vehicles"). Like all of the laws at issue in those cases, the WLAD's public accommodations provision is a neutral health and safety regulation. Under our long-standing precedent, such laws satisfy strict scrutiny in an article I, section 11 challenge.

To be sure, none of our previous article I, section 11 cases addressed an antidiscrimination law. But numerous other courts have heard religious free exercise challenges to such laws and upheld them under strict scrutiny. *E.g., Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 281-83 (Alaska 1994) (in rental housing context, state antidiscrimination law passed strict scrutiny—meaning that defendants were not entitled to a religious exemption—because "[t]he government views acts of discrimination as independent social evils even if the prospective tenants ultimately find housing"; moreover, "[v]oluntary commercial activity does not receive the same status accorded to directly religious activity"); *State v. Sports*

*& Health Club, Inc.*, 370 N.W.2d 844, 852-54 (Minn. 1985) (in employment context, state antidiscrimination law passed strict scrutiny in religious free exercise challenge because "[t]he state's overriding compelling interest of eliminating discrimination based upon sex, race, marital status, or religion could be substantially frustrated if employers, professing as deep and sincere religious beliefs as those held by appellants, could discriminate against the protected classes"); *N. Coast Women's Care Med. Grp., Inc. v. Superior Court*, 44 Cal. 4th 1145, 1158-59, 189 P.3d 959, 81 Cal. Rptr. 3d 708 (2008) (assuming that strict scrutiny applied as a matter of state constitutional law, it would not invalidate statute barring discrimination on the basis of sexual orientation as applied to fertility clinic with religious objections to helping gay patients conceive; "[t]he Act furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and there are no less restrictive means for the state to achieve that goal" (citing CAL. CIV. CODE § 51)); *Gay Rights Coal. of Georgetown Univ. Law Ctr. v. Georgetown Univ.*, 536 A.2d 1, 31-39 (D.C. 1987) (District of Columbia's Human Rights Act, former D.C. CODE § 1-2520 (1981), *recodified as* D.C. CODE § 2-1402.41, as applied to prohibit defendant university from denying equal recognition and support to gay student groups, survived strict scrutiny in university's pre-*Smith* free exercise challenge; "[t]o tailor the Human Rights Act to require less of the University than equal access to its 'facilities and services,' without regard to sexual orientation,

would be to defeat its compelling purpose[:] [t]he District of Columbia's overriding interest in eradicating sexual orientation discrimination, if it is ever to be converted from aspiration to reality, requires that Georgetown equally distribute tangible benefits to the student groups"); *see also Bob Jones Univ.*, 461 U.S. at 602-04 (federal government's denial of tax exempt status to schools that enforced religiously motivated racially discriminatory policies survived strict scrutiny; "the Government has a fundamental, overriding interest in eradicating racial discrimination in education . . . [, and] [t]hat . . . interest substantially outweighs whatever burden denial of tax benefits places on petitioners' exercise of their religious beliefs"). Indeed, we are not aware of any case invalidating an antidiscrimination law under a free exercise strict scrutiny analysis.

Nevertheless, Stutzman argues that strict scrutiny is not satisfied in this case. She reasons that since other florists were willing to serve Ingersoll, no real harm will come from her refusal. And she maintains that the government therefore can't have any compelling interest in applying the WLAD to her shop. In other words, Stutzman contends that there is no reason to enforce the WLAD when, as she puts it, "[N]o access problem exists." Br. of Appellants at 46.

We emphatically reject this argument. We agree with Ingersoll and Freed that "[t]his case is no more about access to flowers than civil rights cases in the 1960s were about access to sandwiches." Br. of Resp'ts Ingersoll & Freed at 32. As every

other court to address the question has concluded, public accommodations laws do not simply guarantee access to goods or services. Instead, they serve a broader societal purpose: eradicating barriers to the equal treatment of all citizens in the commercial marketplace. Were we to carve out a patchwork of exceptions for ostensibly justified discrimination,[27] that purpose would be fatally undermined.

In conclusion, we assume without deciding that strict scrutiny applies to the WLAD in this article I, section 11 challenge, and we hold that the law satisfies that standard.

### E. As Applied in This Case, the WLAD Does Not Violate Stutzman's Right to Free Association under the First Amendment to the United States Constitution

Stutzman argues that the WLAD, as applied by the trial court in her case, violates her First Amendment right to freedom of association. But to support that argument, she relies exclusively on cases addressing membership in private clubs: *Boy Scouts of America v. Dale*, 530 U.S. 640, 653, 120 S. Ct. 2446, 147 L. Ed. 2d

---

[27] Stutzman argues that discrimination cannot be "invidious"—and thus subject to governmental prohibition—if it is based on religious beliefs. Br. of Appellants at 40-43. But she cites no relevant legal authority for this novel theory. In fact, the relevant legal history is to the contrary. *E.g.*, *Piggie Park*, 390 U.S. at 402 n.5. She also argues that the government has no compelling interest in forcing her to speak or associate with Ingersoll or any other customer. But, as explained elsewhere in this opinion, the WLAD does not implicate Stutzman's rights of speech or association.

554 (2000); *Hurley*, 515 U.S. at 574; and *Roberts*, 468 U.S. at 618.[28] These cases expressly distinguish a business' customer service (subject to generally applicable antidiscrimination laws) from expressive conduct (protected from such laws by the First Amendment). *Dale*, 530 U.S. at 648, 656-57 ("To determine whether a group is protected by the First Amendment's expressive associational right, we must determine whether the group engages in 'expressive association'"; antidiscrimination law violated the Boy Scouts' First Amendment freedom of association in part because the Boy Scouts was a membership organization instead of a "clearly commercial entit[y]."); *Hurley*, 515 U.S. at 572, 571 (state antidiscrimination law at issue traditionally applied to "the provision of publicly available goods, privileges, and services" by, "[a]t common law, innkeepers, smiths, and others who 'made profession of a public employment'"; but it would be "peculiar" to extend that law beyond the customer service context so that it applied to the inherently expressive conduct of marching in a parade).

In fact, the United States Supreme Court has even held that states may enforce antidiscrimination laws against certain private organizations, defined by particular goals and ideologies, if the enforcement will not impair the group's ability to pursue

---

[28] Stutzman also cites one case addressing speech: *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818, 120 S. Ct. 1878, 146 L. Ed. 2d 865 (2000). Reply Br. of Appellants at 28. This opinion addresses Stutzman's free expression claim elsewhere.

those goals and espouse those ideologies. *Roberts*, 468 U.S. at 628 (even though First Amendment protects private groups, those groups are subject to antidiscrimination laws to the extent that enforcement "will [not] change the content or impact of the organization's speech").

But the Supreme Court has never held that a commercial enterprise, open to the general public, is an "'expressive association'" for purposes of First Amendment protections, *Dale*, 530 U.S. at 648. We therefore reject Stutzman's free association claim.

F. As Applied in This Case, the WLAD Does Not Violate Stutzman's Constitutional Protections under the "Hybrid Rights" Doctrine

Stutzman also argues that the WLAD, as applied to her in this case, triggers strict scrutiny because it implicates "hybrid rights." Br. of Appellants at 40. As noted above, a law triggers strict scrutiny if it burdens *both* religious free exercise *and* another fundamental right such as speech or association. *First Covenant* II, 120 Wn.2d at 217-18 ("[t]he less protective free exercise standard set forth in *Smith* . . . does not apply because the case presents a 'hybrid situation': First Covenant's claim involves the free exercise clause in conjunction with free speech" (citing *Smith*, 494 U.S. at 904 (O'Connor, J., concurring in judgment))). But Stutzman's claim fails for two reasons. First, the only fundamental right implicated in this case is the right to religious free exercise. Stutzman's rights to speech and association are not

burdened. *See supra* Sections IV.B, E. Second, even if the WLAD does trigger strict scrutiny in this case, it satisfies that standard. *See supra* Section IV.D.ii.

### G. The Trial Court Did Not Err by Imposing Personal Liability on Stutzman Instead of Solely on Her Corporation, Arlene's Flowers Inc.

In addition to finding that Stutzman violated the WLAD, the trial court also found that Stutzman violated the CPA. This is because the WLAD provides that an act of public accommodation discrimination is an "unfair practice" and a per se violation of the CPA. RCW 49.60.030(3).[29] Stutzman concedes that if she violated the WLAD, then Arlene's Flowers is liable for a CPA violation.

But Stutzman argues that she cannot be *personally* liable for violating the CPA because (1) she kept her affairs separate from Arlene's Flowers' and (2) no Washington court has ever applied the "responsible-corporate-officer doctrine" outside the fraud context. Br. of Appellants at 49 (citing *Grayson v. Nordic Constr. Co.*, 92 Wn.2d 548, 552-53, 599 P.2d 1271 (1979); *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 108 Wn. App. 330, 347-48, 30 P.3d 504 (2001), *aff'd in part and rev'd in part*, 148 Wn.2d 319, 61 P.3d 1094 (2002)).

---

[29] The trial court also found that Stutzman's actions violated the CPA—because they were an "'unfair or deceptive act or practice . . . occurring in trade or commerce, and [impacting the] public interest'"—even if she did not also violate the WLAD. CP at 2634-37 (quoting *State v. Kaiser*, 161 Wn. App. 705, 719, 254 P.3d 850 (2011)). This ruling is questionable, but because we conclude that Stutzman did violate the WLAD, and because Stutzman did not assign error to this ruling in her opening brief, we do not address it.

The authority Stutzman cites does not support this argument. In *Grayson*, this court held that the defendant could be personally liable for his company's CPA violation *even though* there were no grounds for piercing the corporate veil. 92 Wn.2d at 553-54. This directly contradicts Stutzman's theory that she cannot be personally liable under the CPA unless she commingled her finances with Arlene's Flowers'. And the other case, *One Pac. Towers*, 108 Wn. App. 330, does not address a CPA claim.

On the other hand, there is long-standing precedent in Washington holding that individuals may be personally liable for a CPA violation if they "participate[] in the wrongful conduct, or with knowledge approve[] of the conduct." *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 322, 553 P.2d 423 (1976). Liability for such participation or approval does not depend on piercing the corporate veil. *Id.* This is consistent with the CPA's plain language, which authorizes the attorney general to bring an action "against any *person* to restrain and prevent the doing of any act herein prohibited or declared to be unlawful," RCW 19.86.080(1) (emphasis added), and which defines "person" to include, "where applicable, natural persons," as well as corporate entities, RCW 19.86.010(1).

Such individual liability does not constitute an application of, or expansion of, the responsible corporate officer doctrine. That doctrine expands liability from a corporation to an individual officer who would not otherwise be liable "where the

73

officer stands 'in responsible relation to a public danger.'" *Dep't of Ecology v. Lundgren*, 94 Wn. App. 236, 243, 971 P.2d 948 (1999) (quoting *United States v. Dotterweich*, 320 U.S. 277, 281, 64 S. Ct. 134, 88 L. Ed. 48 (1943)). Here, the trial court did not find Stutzman (the individual) vicariously or secondarily liable based on conduct of Arlene's Flowers (the corporation). It found her liable because of acts that she herself committed.

V. We previously ordered that any award of attorney fees and costs shall include attorney fees and costs on appeal, and that order remains in effect

Respondents Freed and Ingersoll request an award of attorney fees and costs on remand. After we issued our first opinion in this case, we ordered the trial court to include attorney fees and costs on appeal in its award of attorney fees and costs to Freed and Ingersoll. This order remains in effect; the trial court shall determine the amount of attorney fees and costs on appeal.

CONCLUSION

The State of Washington bars discrimination in public accommodations on the basis of sexual orientation. Discrimination based on same-sex marriage constitutes discrimination on the basis of sexual orientation. We therefore hold that the conduct for which Stutzman was cited and fined in this case—refusing her commercially marketed wedding floral services to Ingersoll and Freed because theirs would be a same-sex wedding—constitutes sexual orientation discrimination under

74

the WLAD. We also hold that the WLAD may be enforced against Stutzman because it does not infringe any constitutional protection. As applied in this case, the WLAD does not compel speech or association. And assuming that it substantially burdens Stutzman's religious free exercise, the WLAD does not violate her right to religious free exercise under either the First Amendment or article I, section 11 because it is a neutral, generally applicable law that serves our state government's compelling interest in eradicating discrimination in public accommodations.

After careful review on remand, we are confident that the courts resolved this dispute with tolerance, and we therefore find no reason to change our original judgment in light of *Masterpiece Cakeshop*. We again affirm the trial court's rulings.

No. 91615-2

_George McCloud, Jr._

WE CONCUR:

_Fairhurst, C.J._

_Johnson, J._

_Madsen, J._

_Owens, J._

_Stephens, J._

_Wiggins, J._

_González, J._

_Yu, J._

76